## SMITH v. UNITED STATES.

### No. 1466.

District Court, D. Montana, Great Falls
Division.

April 25, 1940.

Busha & Greenan, of Great Falls, Mont.,
for plaintiff.

John B. Tansil, U. S. Atty., of Billings,
Mont., and R. Lewis Brown, Asst. U. S.
Atty., and F. J. McGan, both of Butte,
Mont., for defendant.

PRAY, District Judge.

This is an action on a ten thousand dol-
lar war risk term insurance contract, is-
sued to Frank French on November 27th,
1917, wherein he named the plaintiff, Edna
Amelia Smith, his sister, of Nelson, Mon-
tana, as beneficiary.

Frank French enlisted in the army of the
United States at Choteau, Teton County,
Montana, September 22nd, 1917, and left
the United States for overseas service April
7th, 1918. He appears to have been paid to
and including May, 1918. He was reported
absent without leave on June 12th, 1918,
and was dropped as a deserter June 22nd;
he was returned as a prisoner September
20th, 1918, and attached to Battery F, 15th
Field Artillery, and placed in confinement;
again on November 20th, 1918, he was ab-
sent without leave from confinement, and
was again dropped as a deserter on Novem-
ber 30th, 1918. From the evidence it ap-
pears that one Christian Anderson applied
to a hospital in France, in January, 1919,
for medical attention; he presented no
service record and made an affidavit that he
was last paid to include April, 1918 and that
he had a claim "E" allotment for a Liberty

loan in the amount of $5 per month and had taken out war risk insurance in amount of ten thousand dollars at the age of 21; that the premiums were $6.50 and that he did not owe the government any other sums; he was paid, according to his affidavit, as Christian Anderson from April, 1918 to April, 1919, and there was taken from his pay $71.50 to pay back premiums on the insurance he stated that he had applied for; other sums paid him included the month of May and to June 16th, 1919, the date of his death.

Thereafter the Quartermaster Department of the army identified the body buried as Christian Anderson, as that of Frank French who was last dropped from the rolls as a deserter from the army on November 30th, 1918.

Under the state of facts presented in this case it is the contention of plaintiff that the insurance contract of French was in force on the date of his death June 16th, 1919, and if it should be held not to be in force on that date, then it was in force on November 30th, 1918; and if the body buried as Christian Anderson was not the body of Frank French, then the Court should find that his death occurred on November 30th, 1918, by reason of his unexplained absence, that being the date on which he was dropped as a deserter. The last reason given will not have to be considered further, since the Court is satisfied with the proof of identity of Christian Anderson as Frank French.

The government contends that when French first absented himself without leave on June 12th, 1918, he forfeited all pay and allowances due him and that from that date there was no pay due him for a period of more than 60 days which could be applied to keep his insurance in force, and that his contract lapsed under the regulations of the Veterans Bureau for nonpayment of premium due June 30th, 1918, with July 30th, 1918, as the end of the period of grace, and that following that date no application was ever made, either by Frank French or Christian Anderson, for reinstatement of this contract of war risk insurance; and it is the government's further contention "that the fraudulent affidavit of Christian Anderson can in no way effect a revival of this insurance contract." It appears that under regulations, then and now in force, a soldier could not be dropped from the rolls

as a deserter until an investigation had been made and not until ten days after he had first absented himself without leave.

It appears that French received his pay as a soldier from October, 1917, to May, 1918, inclusive, and received no pay thereafter. The pay rolls for October and November, 1918, show notations due soldier of $7.50 per month on account of supplemental service record, but the insured was not paid this money. The evidence shows that if the insured's service record had been available at the time this pay roll was made, it would not have shown that he was entitled to such sums.

The affidavit of Christian Anderson, heretofore referred to, was made on March 28th, 1919, and was as follows:

"I, Christian Anderson, Serial No., No. number, Private 3rd Training Casual Replacement, having been duly sworn according to law, depose and say that I entered the military service September 22, 1917, at Choteau, Montana. I have the following allotments: Class 'E' (Class E was the Liberty Loan allotment, $5.00) effective November 1, 1917, for 10 months, and have taken out $10,000.00 War Risk Insurance, at the age of 21, Premium $6.50, and am further indebted to the Government in the amounts: Nothing. I have had it explained to me and fully understand that any falsification contained herein makes me liable to prosecution for making a fraudulent claim.

"(Signed) Christine Anderson.

"Subscribed and sworn to before me this twenty-eighth day of March, 1919, Base Hospital No. 208, Tolouse (Gironde), France, APO #705, AEF.

"(Signed) Harold S. McConnell,
"2nd Lieutenant, Sanitary Corps
"Base Hospital #208
"Personnel Adjutant"

On the strength of the foregoing affidavit and pursuant to army regulations the affiant Anderson, otherwise Frank French, was given his pay from time to time by the military authorities, who believed him to be Christian Anderson, according to his written statement duly sworn to.

The soldier could not enter into two separate and distinct contracts of war risk insurance by pretending to be another person in the second contract. The government accepted the affidavit of French under the false name of Christian Anderson, believing

that the soldier was Christian Anderson; and after an investigation found his beneficiary and paid him under the Christian Anderson contract insurance benefits amounting to the sum of $5,663.

What prompted French to perpetrate such a fraud upon the government is not easily explained, and there is no evidence pointing directly to the answer; it may have been because of his fear of the consequences based upon charges of double desertion. The thousands of dollars paid out on this false claim supported by the affidavit of French, alias Anderson, is probably lost to the government; how different the result might have been under other circumstances and how much these benefits would have meant to the plaintiff who according to the evidence was a devoted sister and entitled to better treatment at the hands of her brother. Counsel for plaintiff seems to think that he has found enough money here and there that if placed to the credit of French would have continued his insurance in force, but if the court has correctly interpreted the evidence bearing on this feature of the case the policy lapsed as above noted and no effort was ever made for its reinstatement; however, this court might be in error in that respect, and if so, it is a satisfaction to know that such error can be corrected by a higher tribunal.

The argument thus advanced by plaintiff that there was enough money available to pay premiums on French's contract of insurance from the moneys deducted from his pay for the purchase of a Liberty bond seems to be contrary to the law and the evidence. Allotment of pay to a banking institution for the purchase of Liberty bonds was authorized by Bulletin 41 of the War Department. A certified copy of such allotment signed by Frank French was produced by the government, showing an assignment of $5 per month from his pay to the Fidelity Trust Company, Tacoma, Washington. The question is, whether money deducted from the soldier's pay for that purpose is a deposit with the United States and available for premium payments on insurance contracts. The Comptroller of the Treasury agrees with the opinion of the Judge Advocate General of the Army, approved by the Secretary of War, that the government has no further jurisdiction over the money as pay of a soldier after it has been paid over by the United States to the bank. "The money so allotted is not money deposited by the soldier with the United States, but is deposited to his credit in a bank through which his bond is purchased."

Plaintiff advances the further argument that there is no proof that the money allotted for the purchase of the bond was ever paid over to the Tacoma bank. This particular transaction was authorized by a regulation the validity of which has not been challenged and, as it seems to the court, in the absence of proof to the contrary, the presumption would prevail that official duty has been duly and regularly performed. If plaintiff asserts that official duty was not performed as required by the regulation would not the burden of establishing that fact rest upon the plaintiff; the records of the Department were equally available to plaintiff.

The claim of plaintiff that after French was noted as a deserter the first time, he was afterwards restored to duty and would therefore be entitled to pay, is not sustained by the evidence. The testimony of Colonel Munson, who for many years has held a responsible post in the War Department, explained that situation clearly. When Frank French was returned to military control the records of his battery showed that he was confined for desertion, and this status deprived him of his pay. (Regulations 129, 130, 131, 1371, 1372, 1373 of the United States Army.)

No application was ever made for reinstatement of the insurance, although the following provision for relief to the soldier for that purpose was available: "If any premium be not paid, either in cash or by deduction as herein provided, when due or within the days of grace, this insurance shall immediately terminate, but may be reinstated within six months upon compliance with the terms and conditions specified in the regulations of the bureau". (Bulletin No. 1 V. B.)

In respect to reinstatement of lapsed insurance T. D. 32 Par. 1, provided as follows: "If the insurance has lapsed for nonpayment of premiums while the insured is in the active military or naval service, such insurance may be reinstated (a) if application is made at any time within 31 days after the date of lapse without evidence of insurability and on proof satisfactory to the bureau that the applicant is not permanently and totally disabled, and (b) if application is made any time subsequent to

31 days and within six months after the date of lapse upon certification by any army or naval surgeon or any official medical board by the Army or Navy that the insured is in sound health and insurable, or, in case no such surgeon or board is accessible, upon certification of insurability, satisfactory to the bureau, by at least two other reputable physicians or surgeons."

There was another regulation indicating when the insurance would terminate: "When the insured shall have been, for a period of 60 days or more, in a status in which no pay, applicable to the payment of premiums shall have accrued." (T. D. 33 Veterans Bureau.)

The plaintiff takes the position that the soldier, Frank French, must be proven guilty of the crime of desertion before his pay could be forfeited. No such conviction could have been secured after he had been carried on the rolls as a deserter the second time, as he was never apprehended or again brought under military control. In reference to this subject counsel for the government has undoubtedly correctly interpreted Section 447 of Title 38, U.S.C.A., in contending that the last half of that section beginning with the words: "or that he was an alien, conscientious objector who refused to perform military duty or refused to wear the uniform, or a deserter * * *" bars all rights to the statutory benefits without reference to any court-martial proceeding. As further support to this construction of Section 447, the Comptroller General of the United States held: "* * * that the provision under consideration refers to the discharge or dismissal but there would seem to be no doubt that the Congress intended the act of desertion rather than any formal certificate or order of discharge or dismissal as the bar. The statute does not require that the desertion be established by a court-martial. The act of desertion is the offense and the notation thereof on the record is prima facie evidence of the desertion and is tantamount to a discharge or dismissal on the ground of desertion, in that it shows how the actual service was terminated, although it does not release the man from his enlistment obligation." 3 Comp. Gen. 691; 4 Comp.Gen. 36; 4 Comp.Gen. 171; and 5 Comp.Gen. 857.

Conforming to the foregoing views, the judgment herein should be awarded in favor of the defendant, and such is the order of the Court. Appropriate findings of ultimate facts may be submitted.